IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Case No. 09-cv-02140-PAB-KLM

BEIRA COVAS-ALVAREZ,

    Plaintiff,

v.

THE WESTERN STOCK SHOW ASSOCIATION, a Colorado nonprofit corporation, d/b/a THE NATIONAL WESTERN STOCK SHOW,

    Defendant.

## ORDER

This matter is before the Court on defendant's motion to dismiss [Docket No. 7] plaintiff's complaint. The motion is ripe for disposition.

## I. BACKGROUND

Defendant, The Western Stock Show Association ("the Association"), is a nonprofit organization that puts on The National Western Stock Show (the "stock show") each January in Denver, Colorado. In the summer of 2007, the Association contracted with Jason Adams of The West Agency ("West") to "identify, research, and engage potential sponsors[,] [w]ork with existing sponsor relations, develop[] [] sponsor value, and provide consultation to [the Association]" for the upcoming 2008 stock show. Docket 20-1 at 2; *see* Docket 22-3 at 2, ¶¶ 2-3. Plaintiff Beira Covas-Alvarez worked for West as a Senior Consultant of Cultural Marketing at the time.

In September 2007, Marvin Witt and Leon Vick of the Association "indicated [to Mr. Adams] that the [Association's sponsorship] department needed clerical support."

Docket No. 22-3 at 3, ¶ 9. After meeting with Mr. Witt, Mr. Vick and Mr. Adams in early October, plaintiff agreed to spend most of her time working out of the Association sponsorship office as West's "onsite representative" providing assistance to Leon Vick of the Association. In December 2007, Mr. Adams attended a meeting at the Association during which he contends Mr. Vick made an inappropriate comment to plaintiff. Upon being asked by Mr. Adams whether the comment was an isolated occurrence, plaintiff indicated that it was not. Mr. Adams communicated his concerns to Pat Grant, the president of the Association, but Mr. Adams was not satisfied with the response.

Furthermore, plaintiff contends that the Association thereafter retaliated against her for Mr. Adams' complaint. She "reported to [Mr. Adams] that she was being excluded from meetings, both staff and marketing, that she would have typically attended with Mr. Vick." Docket No. 22-3 (Adams Aff.) at 6, ¶ 32; *see id.* at 6, ¶ 30. In light of alleged subsequent retaliation by the Association, Mr. Adams removed plaintiff from her position with the Association in February 2008.

The circumstances surrounding plaintiff's placement in the sponsorship office and the nature of her work is at the center of the parties' dispute. Plaintiff contends that the Association's sponsorship office, and Leon Vick specifically, was in need of clerical support in the months leading up to the stock show and that Jason Adams, plaintiff's supervisor and an employee of West, suggested to the Association that plaintiff could provide that assistance. Defendant contends, by contrast, that plaintiff was serving as an onsite representative of West, working out of the sponsorship office in order to

2

support West's consultancy to the Association.[1]

Plaintiff filed this lawsuit in state court. The Association removed the case to this Court on September 8, 2009 [Docket No. 1]. Plaintiff's complaint brings claims of harassment and retaliation pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the Colorado Anti-Discrimination Act ("CADA"), Colo. Rev. Stat. § 24-34-402(1)(a). The Association filed the present motion on September 15, 2009 pursuant to Federal Rule of Civil Procedure 12(b)(6), seeking the dismissal of plaintiff's complaint because plaintiff was not its "employee" and, therefore, may not recover under Title VII and CADA. On November 16, 2009, Magistrate Judge Kristen Mix granted the parties' joint motion for stay of discovery and granted the parties permission to conduct discovery on the limited issue of plaintiff's employment status [Docket No. 16]. The parties have completed that discovery and filed supplemental briefs. Consequently, the Court will convert defendant's motion to dismiss into a motion for summary judgment on the limited question of whether plaintiff was an "employee" of the Association.[2]

## II. STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56(c) when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is

---

[1]The evidence relating to her position will be discussed in greater detail below.

[2]Because "matters outside the pleadings [have been] presented . . . and not excluded" and "[a]ll parties [have been] given a reasonable opportunity to present all the material that is pertinent to the motion," such conversion of the motion is appropriate. Fed. R. Civ. P. 12(d).

3

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986); *Concrete Works, Inc. v. City & County of Denver,* 36 F.3d 1513, 1517 (10th Cir. 1994); *see also Ross v. The Board of Regents of the University of New Mexico*, 599 F.3d 1114, 1116 (10th Cir. 2010). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee,* 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *Id.*; *see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

### III.  DISCUSSION

The sole issue presented to the Court on this motion is whether there is a genuine issue of material fact regarding whether plaintiff was an "employee" of the Association. *See Gioia v. Pinkerton's Inc.* 194 F. Supp. 2d 1207, 1213 (D.N.M. 2002). "'Title VII protections apply only where there is some connection with an employment relationship.'" *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991) (quoting *Baker v. McNeil Island Corrections Center*, 859 F.2d 124, 127 (9th Cir. 1988)). "[E]mployee status is an element of [plaintiff's] Title VII claims rather than a threshold jurisdictional requirement." *Xie v. University of Utah*, 243 F. App'x 367, 369 (10th Cir. 2007)

4

(unpublished). In determining whether plaintiff is an "employee" of defendant, both parties rely upon the "joint-employer" test in *Bristol v. Board of County Commissioners*, 312 F.3d 1213 (10th Cir. 2002). In *Bristol*, the Tenth Circuit clarified the approach a court should take in determining whether an individual is an "employee" for purposes of the Americans with Disabilities Act ("ADA"). *Cf. Bristol*, 312 F.3d at 1217 (where the court pointed out that "'[e]mployer' is defined, *as in Title VII*, as 'a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.'") (citation omitted and emphasis added). The Tenth Circuit rejected application of the "hybrid test" – which applies in cases where a court must "distinguish[] an employee from an independent contractor" – "where there is no allegation that [plaintiff] is an independent contractor . . . ." *Id.* at 1217-18.[3] The Court cited "two other tests that are more applicable . . .: the joint-employer test and the single-employer test." *Id.* at 1218.

Under the "joint-employer test," the Association and West will be deemed "joint employers if [they] 'share or co-determine those matters governing the essential terms

---

[3] *See Bristol*, 312 F.3d at 1217 n.4 ("Under the hybrid test, the factors used to determine whether a plaintiff is an employee or an independent contractor include the employer's right to control the 'means and manner' of the worker's performance as well as: (1) the kind of occupation at issue, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the employer or the employee furnishes the equipment used and the place of work; (4) the length of time the individual has worked; (5) the method of payment, whether by time or by job; (6) the manner in which the work relationship is terminated; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.") (citations and quotation marks omitted).

and conditions of employment.'" *Id.* (quoting *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1360 (11th Cir. 1994)). "In other words, courts look to whether both entities 'exercise significant control over the same employees.'" *Id.* (quoting *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997)); *see Blagg v. Technology Group, Inc.*, 303 F. Supp. 2d 1181, 1185 (D. Colo. 2004) ("[C]ontrol is the central issue."). The "joint employment relationship . . . is employee-specific" – it is "determined by focusing on the entities' relationships to a given employee . . . ." *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1324 (10th Cir. 2004); *see Hurde v. Jobs Plus-Med*, 299 F. Supp. 2d 1196, 1209 (D. Kan. 2004) ("An independent entity with sufficient control over the terms and conditions of the employment of a worker formally employed by another is a joint employer within the scope of Title VII.").

The Association contends that (1) the terms of the agreement between West and the Association (which disclaim any rights of the Association to control an employee of West); (2) West's placement of plaintiff onsite and its control of her responsibilities; (3) West's payment of plaintiff's salary; and (4) West's sole authority to terminate plaintiff establish that the Association was not plaintiff's employer. *See generally* Docket No. 20. The Court concludes that the record reveals no genuine issues of material fact in regard to these contentions and that the Association is entitled to judgment as a matter of law. Although "[a]s a general rule, 'determining whether an entity qualifies as an employer is a fact issue for the jury," *Bristol*, 312 F.3d at 1221, here there is no evidence upon which a jury could conclude that the Association exercised sufficient control over plaintiff to be deemed her employer for purposes of Title VII.

The Court begins by addressing the agreement between West and the Association. It is undisputed that, pursuant to that agreement, Jason Adams and West are independent contractors providing services to the Association. *See* Docket No. 20-1. As part of that independent contractor arrangement, "[the Association] . . . expressly waives and denies any responsibility for the control or the right of control of the performance of the functions, obligations and duties of the Independent Contractor or his employees or agents. . . ." Docket No. 20-1 at 4. Mr. Adams contends that he later suggested that this Agreement be amended to include a provision for West to supply the Association with an "onsite representative," but that the Association claims "this was never done." Docket No. 22-3 at 3, ¶ 11. The suggested arrangement appears to be laid out in an October 3, 2007 letter from Mr. Adams to the Association. *See* Docket No. 20-8.[4]

Although the agreement may never have been formally amended to include reference to the onsite representative, the October 3 letter references West's provision of an onsite representative as part of the services West would provide the Association. *See* Docket No. 20-8 at 2. Plaintiff's placement in the Association's sponsorship office was part of West's objective to "provide services and an onsite representative in order to continue to develop both strategic and tactical marketing/sponsorship team/division of [the Association]." *Id.* at 1. Plaintiff was to "[w]ork hand in hand with Sponsorship

---

[4]This copy of the letter appears to be an unsigned draft. The Association, however, cites an "October 3, 2007 letter to Pat Grant." Docket No. 20 at 8. Plaintiff also represents that "Mr. Adams sent Mr. Witt and Mr. Grant a letter outlining how he thought Ms. Covas-Alvarez could benefit [the Association] temporarily." Docket No. 22 at 8 (citing Docket No. 20-8).

Manager, Leon Vick, to accomplish all objectives through the end of the 2008 event." *Id.* The benefits Mr. Adams believed this arrangement afforded the Association included "fulfill[ing] an immediate need without making a long term commitment" and "free[ing] [the Association] from overtime, workers comp, and an additional employee costs [sic]." *Id.* at 3. The only proposed change to the original contract between West and the Association was to include "the new onsite representative marketing consultant" and to arrange for a fee "derived from a 40 hour week at $28 an hour." *Id.* The letter describes plaintiff's services as part of the package provided by West to the Association and highlights the benefits the Association will receive by not having to hire an employee. The evidence regarding plaintiff's placement in the sponsorship office is largely consistent with the October 3 letter, and nothing in the letter excepts plaintiff from the Association's express waiver of responsibility over West's agents and employees.[5]

The Association contends that West decided to place plaintiff onsite with the Association as a representative of West to assist West in sponsorship development pursuant to its contract with the Association. *See* Docket No. 22-1 ("Witt Depo.") at 36, ll. 5-7; *id.* at 40, ll. 20-21. According to the Association, while plaintiff worked onsite, she worked for the benefit of West and was supervised by Mr. Adams. During his deposition, however, Mr. Vick stated that plaintiff filled the position as his assistant at

---

[5]The Court notes that nowhere in the complaint does plaintiff specifically allege that she was an employee of the Association. *See generally* Docket No. 1-1. She does allege that, "[i]n or around October 2007, Ms. Covas-Alvarez began working for [the Association]." Docket No. 1-1 at 6, ¶ 66; 7, ¶ 77. She also alleges that, "[a]t all relevant times, Ms. Covas-Alvarez reported directly to and her duties were controlled by Vick and [the Association]." Docket No. 1-1 at 2. ¶ 11.

the Association:

> Q. Do you know what prospective job [Mr. Adams] may have been discussing with Mr. [Marvin J.] Witt [the Association's Vice President of Operations]?
> A. Yes.
> Q. What was that job?
> A. To provide someone to assist in the sponsorship department.
> Q. What type of assistance did the sponsorship department need?
> A. Clerical.
>     * * *
> Q. . . . So you, as the sponsorship manager, needed assistance?
> A. Correct.
> Q. . . . And you needed clerical assistance?
> A. Correct.

Docket No. 22-2 at 27, ll. 9-17 - 28, ll. 4-9. Mr. Vick stated that plaintiff, in order to assist him, "would help fill in the blanks [on form contracts] and save those on the computer." *Id.* at 29, ll. 20-21. Mr. Vick decided which contracts plaintiff would fill in, *id.* at 30, ll. 6-8, and provided her with the required information. *Id.* at 32, ll. 2-4. According to Mr. Vick, Mr. Adams was involved in certain of these contracts, but not all of them. *Id.* at 32, ll. 11-13. Mr. Vick described plaintiff's position as "assist[ing] [him] in the sponsorship department." *Id.* at 33, ll. 15-17. Mr. Vick would take plaintiff to sponsorship department meetings "[b]ecause she was assisting [him] . . ." Docket No. 22-2 at 39, ln. 21. Plaintiff also assisted Mr. Vick with the daily coordination of a particular daily event during the stock show in January 2008. Mr. Vick stated that Mr. Adams had no role in that event and that the work did not benefit West. *See* Docket No. 22-2 at 46, ll. 23-25 - 47, ll. 1-3.

That plaintiff's work benefitted the Association and supported Mr. Vick's duties, however, is not dispositive. Plaintiff's role as an onsite representative of West was

certainly designed to benefit the Association and fill needs it had during the stock show, including clerical assistance for Mr. Vick. That benefit, however, was received as part of the Association's agreement with West, as an independent contractor, to provide supportive services to the sponsorship department. Plaintiff supplies no evidence that her position as an onsite representative of West altered the independent contractor arrangement between West and the Association. *Cf.* Compl. [Docket No. 1-1] at 2, ¶ 7 ("In or around September 2007, [the Association] requested that West place a service representative onsite to work directly for Leon Vick, [the Association's] sponsorship manager and rodeo coordinator.").

The Association also points out that West paid plaintiff for her work and that the Association did not keep a personnel file, or other records, for plaintiff. *See* Docket No. 20 at 9-10. Plaintiff contends that, while West issued paychecks to plaintiff for her time working in the sponsorship department, West billed the Association for her time working onsite. *See* Docket No. 20-16; Docket No. 22-7. This payment arrangement, however, further supports the conclusion that plaintiff served as an onsite representative of West, an independent contractor. Although the parties did not ultimately implement the flat 40-hour a week payment fee, plaintiff was paid $28 per hour, as proposed by Mr. Adams in his October 3 letter. Furthermore, West labeled the charge for plaintiff's time as "On-site Representative." *See, e.g.*, Docket No. 20-16. There is no evidence this payment structure was anything other than a fee paid to West for the provision of its "onsite representative."

Furthermore, while Mr. Vick exercised a measure of supervision over plaintiff, Mr.

Adams would assign plaintiff responsibilities and plaintiff would leave the Association's work site to work on projects for West alone. That alone does not necessarily preclude the finding of a joint-employer relationship. *See Sizova v. Nat'l Institute of Stds. & Tech.*, 282 F.3d 1320, 1330 (10th Cir. 2002) ("'When a worker is formally employed by one organization, but important aspects of his work are subject to control by another organization, both organizations are employers of the worker.'") (citation omitted). Here, however, plaintiff retained the ability to come and go as she pleased. And, as outlined above, when working on assignments onsite and for the benefit of the Association, there is no evidence that plaintiff was anything other than an employee of West providing the Association with services as part of West's status as an independent contractor.

Her status as an employee of only West is further supported by the manner in which she stopped working in the Association's sponsorship office. "Most important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances . . . ." *Bristol*, 312 F.3d at 1219. West retained that authority, which it exercised in January 2008, to remove her from the position without first conferring with or receiving permission from the Association. *See* Docket No. 22-10 at 3 ("[West] is removing Ms. Covas as an on-site representative with the [Association] . . . ."). Plaintiff contends that the Association could have terminated her position as well, but offers no evidence of that; nor is there any indication that doing so would have been anything other than an alteration of its relationship *with West*. There is no indication that it would have altered her position, pay, or overall

responsibilities as an employee of West.  Cf. Zinn v. McKune, 143 F.3d 1353, 1358 (10th Cir. 1998) (finding, in a pre-Bristol case applying the "hybrid test," that "though the contract allowed the Department to request that Ms. Zinn be transferred from the . . . facility, the record is undisputed that PHS alone retained the ability to terminate Ms. Zinn, indicating the Department was not her employer.").  In short, the record contains no evidence that the Association and West shared "'those matters governing the essential terms and conditions of [plaintiff's] employment.'" Bristol, 312 F.3d at 1218 (quoting Virgo v. Riviera Beach Assocs., Ltd., 30 F.3d 1350, 1360 (11th Cir. 1994)).

Although there is no evidence that the Association exercised significant control over the terms and conditions of her employment, plaintiff contends she was held out as an employee by the Association.  Specifically, plaintiff declares that "[d]uring marketing meetings with potential sponsors, [she] would represent that [she] was part of the [Association] sponsorship department, not the West Agency."  Docket No. 22-6 at 4, ¶ 15.  Even if true, that fact alone would not overcome the lack of evidence of control.  As noted above, "control is the central issue." Blagg v. Technology Group, Inc., 303 F. Supp. 2d 1181, 1185 (D. Colo. 2004).  Furthermore, the evidence plaintiff cites does not show that she was held out to the public as an employee of the Association.  The record does contain an email dated December 28, 2007, whereby plaintiff sent Mr. Vick a draft letter to a stock show sponsor for his review that included the following line: "Please call Beira Covas, our Sponsorship Coordinator . . . ."  Docket No. 22-4.  Plaintiff sent that email to Mr. Vick from an address provided by the Association.  The signature block of her email included "The National Western Stock Show," "Sponsorship

12

Department," two telephone numbers, and her return National Western email address. *See* Docket No. 22-4. There is not a copy, however, of such a letter going out to a sponsor.[6]

Plaintiff also contends that the "fact that [the Association] acted on Mr. Adams' internal request for an investigation regarding Mr. Vick's harassing and discriminatory behavior, albeit reluctantly, is further evidence that [the Association] believed that Ms. Covas-Alvarez was an employee." Docket No. 22 at 14. In support of that contention, plaintiff cites a concurring opinion in *Zinn*. *Cf. Zinn*, 143 F.3d at 1360 (concurring in the majority's conclusion regarding retaliation and state law whistle-blower claims, but concluding that "Zinn has made a sufficient showing of a dual employer relationship to survive summary judgment") (Briscoe, J., concurring). Plaintiff has argued that the joint-employer test outlined in *Bristol* should be applied in this case. *Zinn* is a pre-*Bristol* case applying the "hybrid test." In any event, the Tenth Circuit in *Zinn* concluded that an investigation of plaintiff's complaints did "not in any way establish that the Department controlled Ms. Zinn's performance . . . ." *Zinn*, 143 F.3d at 1359.

With that said, and in light of much of the foregoing discussion, this case may indeed implicate the "hybrid test," which the *Bristol* court held does not apply where there is "no allegation that [plaintiff] is an independent contractor." *Bristol*, 312 F.3d at 1218. Here, while both parties rely upon the joint-employer test, Mr. Adams was an independent contractor, and the evidence establishes that plaintiff was working as his

---

[6]Plaintiff alleged in her complaint that "West placed Ms. Covas-Alvarez onsite with [the Association] to work with and report directly to Vick," and that "West removed Ms. Covas-Alvarez as the onsite representative at [the Association] pending the outcome of the investigation." Docket No. 1-1 at 2, ¶ 9 and 3, ¶ 25.

13

agent pursuant to his overall relationship with the Association. Applying the "hybrid test" prior to *Bristol*, the Tenth Circuit in *Zinn* noted that plaintiff was "admittedly an employee of PHS," and the question was whether she was "also an employee of the Department." 143 F.3d at 1358. Although the Court has applied the joint-employer test laid out in *Bristol*, the "hybrid test" is still used to "determine whether a plaintiff is an employee or an independent contractor" in cases where that issue arises. *Bristol*, 312 F.3d at 1217 n.4. *Zinn*'s application of the "hybrid" test is therefore still instructive.

The *Zinn* court described the situation before it as follows: "PHS provided services to the Department as an independent contractor, and PHS employees, merely by fulfilling terms of the Department-PHS service contract, did not thereby become Department employees." *Zinn*, 143 F.3d at 1357. In that context, the court in *Zinn* "reject[ed] Ms. Zinn's argument that the Department 'reimburses' PHS for her salary, and thus the Department employs her . . .; the Department simply pays for the services provided by PHS personnel as provided in the contract, and it is PHS's responsibility to pay wages, salaries, and benefits to PHS personnel." *Zinn*, 143 F.3d at 1358. Moreover, a measure of supervision did not suffice to render the defendant plaintiff's employer in *Zinn*. *See Zinn*, 143 F.3d at 1359 ("[T]he evidence merely indicates that [an employee of defendant] oversaw Ms. Zinn's performance, not that she directed or controlled it on a daily basis."). As in *Zinn*, plaintiff's status here arises out of West's arrangement with the Association. By reimbursing West for her time and exercising some degree of supervision, the Association did not become plaintiff's employer.

Consequently, the Court concludes that, applying the joint employer test, there is

14

no evidence upon which a jury could conclude that the Association was one of plaintiff's employers for purposes of Title VII. Moreover, even if the Court were to apply the "hybrid test," plaintiff has failed to identify a genuine dispute of material fact regarding her employment status.

Finally, plaintiff has also brought claims arising under state law. Pursuant to 28 U.S.C. § 1367(a), the Court has supplemental jurisdiction over those claims, but "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Because the Court will dismiss plaintiff's Title VII claims, it will decline to exercise supplemental jurisdiction over the state law causes of action.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant's motion to dismiss [Docket No. 7], which has been converted into a motion for summary judgment, is GRANTED. It is further

**ORDERED** that judgment shall enter in favor of defendant and against plaintiff. Defendant may have its costs upon compliance with D.C.COLO.LCivR 54.1.

DATED September 17, 2010.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge